Filed 9/14/22  Rago v. Raposo CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BASIL M. RAGO et al.,<br><br>    Plaintiffs and Appellants,<br><br>        v.<br><br>JOSE JACINTO RAPOSO,<br>Individually and as Trustee, etc., et al.,<br><br>    Defendants and Respondents. | A159146<br><br>(Contra Costa County Super. Ct. No. MSC17-01951) |

Basil Rago and Barbara Rago (the Ragos) appeal from a judgment entered against them on a summary judgment ruling in favor of Jose Jacinto Raposo and Laura Raposo (the Raposos).  The case arises out of a real property dispute over the proposed sale of the Raposos' ranch (the ranch), which is owned by the Jose J. and Laura Raposo Living Trust.  The Ragos made an offer to buy the ranch, and negotiations broke off when the Raposos changed their minds about selling and withdrew a counteroffer.  This litigation ensued.

The issue presented here is whether the Raposos effectively revoked their counteroffer before the Ragos accepted it.  The Raposos assert the undisputed facts show they communicated notice of their revocation via a letter to the Ragos' real estate broker (who was also the Raposos' broker),

1

thereby effecting revocation of their counteroffer before the Ragos communicated their acceptance of the counteroffer by email. The Raposos further contend that they confirmed this revocation in a phone call the real estate broker initiated with Laura shortly after the Raposos sent the letter.

The trial court agreed with the Raposos and granted summary judgment in their favor. Arguing for reversal of the ensuing judgment, the Ragos contend the effectiveness of the Raposos' revocation turns on triable issues of fact. Specifically, they argue the revocation was ineffective because: (1) the intent of the Raposos' letter was ambiguous, (2) the real estate broker did not speak with Jose in the phone call about the letter to confirm his intention to withdraw the counteroffer, and (3) the Raposos signed the letter as individuals without referencing their representative capacity as trustees.

We will affirm.

## I. BACKGROUND

The Raposos own a ranch in Brentwood, California. In August 2017, the Raposos, as trustees of the Jose J. and Laura Raposo Living Trust, entered into a residential listing agreement authorizing real estate broker Lori Abreu (Abreu) and her company, Delta Ranches and Homes, to find a buyer for their ranch.

The Ragos wished to acquire the ranch and signed an offer to purchase it on September 19, 2017.[1] Their offer was prepared by Abreu, who acted as a dual agent representing both buyers and sellers in the transaction. The offer was contingent on the sale of real property owned by the Ragos.

On the morning of September 26, Abreu met with the Raposos to discuss the Ragos' offer. The Raposos signed a counteroffer that raised the total purchase price and added a provision that would allow the Raposos to

_____

[1] All subsequent dates are in 2017 unless otherwise noted.

2

lease the property for 90 days after the close of escrow.  The counteroffer specified that the Ragos' acceptance must be in writing.  Later that evening, the Raposos met as a family and decided not to sell the property so their daughter could continue to live on the property with her young child.

It is undisputed that at 9:10 a.m. on September 27, Laura[2] texted Abreu a letter (the letter) signed by both Jose and Laura Raposo, which stated:  "Dear Lori:  As we are not in receipt of a signed accepted counter offer, we wish to cancel any further negotiations with any buyer. [¶] This letter also serves as notice that we wish to cancel our listing agreement with Delta Ranches and Homes, Inc. [¶] Sincerely, [¶] Jose J. Raposo and Laura Raposo."

Shortly after receiving the letter, Abreu called the Raposos and spoke with Laura about the letter.  Telephone records show the call (the phone call) was placed at 10:32 a.m. on September 27.  At her deposition, Laura testified that during the phone conversation, she told Abreu they did not want to sell the property any longer and wanted to "stop the counter."  Abreu testified in her deposition that Laura told her she did not want to sell the property anymore.

During her deposition, Abreu testified she called Basil Rago within 20 minutes of her conversation with Laura Raposo.  She told him the contents of the letter but not that the Raposos no longer wanted to go forward with the sale.  Abreu testified that she did not know the letter was intended to instruct her to cancel the sale and thought the Raposos' letter was only meant to communicate they no longer wanted to negotiate, and the counteroffer was their final offer.

---

[2] We refer to the parties by first name for clarity.  No disrespect is intended.

3

According to her deposition testimony, Abreu gave various reasons for her belief the counteroffer was still live: (1) Laura did not expressly say the Raposos wanted to take the ranch off the market, (2) Abreu did not have a "withdrawal of offer" from the Raposos, and (3) Laura did not explicitly say that Jose also did not want to sell the property.

At 11:38 a.m., Abreu emailed the Raposos' counteroffer documents to Basil for the Ragos' signature. Abreu did not inform the Raposos she was going to send their counteroffer to the Ragos. At 12:30 p.m., Basil and Barbara Rago signed and dated the counteroffer. Basil returned the signed counteroffer to Abreu by email at 1:04 p.m. on September 27. The Ragos do not dispute the time they emailed their counteroffer to Abreu.

In early October 2017, the Ragos listed their own real property for sale and accepted an offer in preparation for moving into the Raposos' property. In April 2019, the Ragos filed the operative complaint in this action alleging breach of contract and seeking to quiet title. The Raposos moved for summary judgment on the ground that no enforceable contract was formed because they revoked their counteroffer prior to its acceptance by the Ragos. The trial court granted the motion and entered judgment in favor of the Raposos.

This timely appeal followed.

## II. DISCUSSION

The central issue in this appeal is whether the Raposos communicated notice of their revocation of their counteroffer to Abreu before the Ragos communicated their acceptance. If the counteroffer was revoked, the Raposos were entitled to summary judgment on the ground that no contract was formed, thereby negating a necessary element of the Ragos' claims for breach of contract and quiet title.

4

## A. *Standard of Review*

We review the trial court's entry of summary judgment de novo. (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 253.) "[S]ummary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A moving defendant can meet its initial burden by showing that one or more elements of the plaintiff's cause of action cannot be separately established. (*Nazir v. United Airlines, Inc.*, *supra*, at p. 253.) Once the defendant meets the initial burden, the burden shifts to the plaintiff to show the existence of a triable issue of material fact. (*Ibid.*)

On appeal, we view the evidence in the light most favorable to the plaintiffs as the parties opposing summary judgment, and we liberally construe the plaintiffs' evidence and strictly scrutinize the defendants' evidence, resolving ambiguities in the plaintiffs' favor. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.) On appeal, "we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.)

Interpretation of a written instrument is a judicial function where interpretation does not turn on the credibility of extrinsic evidence. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) "Extrinsic evidence is 'admissible to interpret the instrument, but not to give it meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect." (*Ibid.*)

## B. *Applicable Principles of Contract*

It is well established the existence of a contract is a necessary element to an action based on contract. (*Roth v. Malson* (1998) 67 Cal.App.4th 552,

557.) Consent of the parties is essential to the formation of a contract. (Civ. Code, § 1550.) The determination of whether a contract has formed is "governed by objective manifestations, not subjective intent of any individual involved. The test is 'what the outward manifestations of consent would lead a reasonable person to believe.'" (*Roth v. Malson, supra*, at p. 557.)

An offer or counteroffer is terminated when the offeror revokes it before it has been accepted and communicates the revocation to the offeror or their agent. (Civ. Code, § 1586; *Ersa Grae Corp. v. Fluor Corp.* (1991) 1 Cal.App.4th 613, 621, fn. 2.) Revocation can be communicated by an "act or omission" of the contracting party by which he or she intended to communicate intent to revoke, or which necessarily tended to communicate that intent. (Civ. Code, § 1581; *Bellasi v. Shackelford* (1962) 201 Cal.App.2d 265, 267–268.) In general, any clear manifestation of unwillingness to enter into the proposed contract is sufficient to revoke an offer. (Rest.2d Contracts, § 42, com. d.) Communication of a revocation is complete when placed in the course of transmission. (Civ. Code, § 1583; *Ersa Grae Corp. v. Flour Corp., supra*, at pp. 621, fn. 2, 622.)

### C. *The Raposos Are Entitled to Summary Judgment Because the Undisputed Material Facts Show the Raposos Notified Abreu of Their Revocation Before Abreu Received the Ragos' Signed Counteroffer*

As an initial matter, the material facts establishing the order of the parties' communications on September 27 are undisputed. The Ragos emailed the signed counteroffer documents to Abreu at approximately 1:04 p.m., more than two hours after Abreu received the Raposos' letter at 9:10 a.m. and spoke by phone at 10:32 a.m. with Laura.

It is also undisputed that Abreu was acting as an agent for the Ragos in the transaction. Communication of notice to the agent, equals notice to the principal. (Civ. Code, § 2332; *Bellasi v. Shackelford, supra*, 201 Cal.App.2d at

6

pp. 267–268 [seller's oral notification of revocation communicated to title company acting as agent of both parties was sufficient to revoke offer].) Thus, any communications sent by the Raposos to Abreu regarding the sale of their property was the same as if it were a direct communication to the Ragos.

Further, it is undisputed that the proposed purchase agreement at issue here expressly required that acceptance of an offer or counteroffer be made in writing by a party and delivered to and received by the other party or their authorized agent. Where an offer or counteroffer requires that acceptance be made in a specified manner, like in writing, no other method of acceptance is effective. (Civ. Code, § 1582.)

What we have, then, is a situation where the Ragos did not accept the counteroffer until 1:04 p.m. when Abreu received the signed counteroffer documents by email, while the Raposos notified Abreu of their revocation as soon as the text containing the letter was placed "in the course of transmission" at 9:10 a.m. on September 27. (Civ. Code, § 1583.) Thus, this appeal turns on whether the letter and/or the 10:32 a.m. phone call between Laura and Abreu later that same morning communicated the Raposos' intention to withdraw their counteroffer and stop the sale of their property such that it constituted a revocation of their counteroffer.

The Ragos contend neither the letter nor phone call communicated the Raposos' intention to withdraw the counteroffer because: (1) the letter was ambiguous, (2) Abreu was unable to speak with Jose about the letter to orally confirm he no longer wanted to sell the property, and (3) the absence of a reference to the Raposos' representative capacity as trustees in the letter rendered the notice ineffective.

We address each argument in turn to determine whether it creates a triable issue of material fact.

### 1. The Raposos' September 27 Letter to Abreu Communicated a Clear Intention To Withdraw the Counteroffer

As stated above, on the morning of September 27, Abreu received the following letter from the Raposos:

"Dear Lori: As we are not in receipt of a signed accepted counter offer, we wish to cancel any further negotiations with any buyer. [¶] This letter also serves as notice that we wish to cancel our listing agreement with Delta Ranches and Homes, Inc. [¶] Sincerely, [¶] Jose J. Raposo and Laura Raposo."

Because the letter does not refer to the Ragos by name and does not explicitly say the Raposos wished to cancel the sale of the ranch, the Ragos contend the letter's intended meaning was ambiguous and reasonably susceptible to an alternative interpretation. In their view, the words "we wish to cancel any further negotiations with any buyer," could reasonably be understood to mean the Raposos no longer wanted to negotiate with any buyers but still wanted to sell their property to the Ragos under the final terms of their counteroffer. We are unpersuaded.

When read as a whole, the intended meaning of the letter is clear; the Raposos wanted to end negotiations with all potential buyers, *including the Ragos*, by withdrawing their counteroffer. The letter begins with the words "[a]s we are not in receipt of a signed accepted counter offer," a clear reference to their outstanding offer to the Ragos. This reference is followed by a universal statement of their desire to cancel negotiations with "any" buyer. Absent any evidence the Raposos were actively negotiating with other interested parties or had more than one outstanding offer when they sent the letter, the only reasonable conclusion is that the Raposos wanted to cease

8

their negotiations with the Ragos and all other buyers. Also, the letter ends by stating the Raposos wanted to immediately cancel their listing agreement with Abreu, reinforcing the conclusion that the Raposos no longer wanted to go forward with the sale.

The Ragos contend Abreu's confusion about the meaning of the letter, demonstrated by her decision to forward the counteroffer documents to Basil Rago despite having read the letter and been told by Laura Raposo that she no longer wanted to sell the property, demonstrates an ambiguity as to the Raposos' intent that should be resolved in their favor. But Abreu's own subjective understanding is irrelevant in determining the letter's intent. The test is what the outward manifestations of consent, or lack of consent in this case, would lead a reasonable person to believe. (*Roth v. Malson*, *supra*, 67 Cal.App.4th at p. 557.) The determination that no contract was formed in *Roth* is illustrative. There, the court held in an action for specific performance of an alleged contract for sale of real property that there was no unqualified acceptance of the seller's counteroffer when the buyer mistakenly signed the counteroffer form in the area labeled "Counter to Counter Offer" instead of the area marked for "Acceptance." (*Id.* at pp. 554, 557.) The court reasoned that when viewed objectively the buyer's response on its face presented itself as a counteroffer even though he subjectively intended to accept. (*Id.* at p. 559.)

When we apply the same reasoning to the facts in this case, we reach the same conclusion. No contract was formed. Looking only at the Raposos' outward expressions of intent as the law requires, the only reasonable conclusion from the letter and subsequent phone call is that the Raposos no longer wanted to sell their property.

9

## 2. Abreu's Inability To Speak to Jose About the Letter To Confirm His Intention To Withdraw the Counteroffer Was Immaterial

The Ragos argue the fact that Abreu was unable to speak with Jose about the letter on September 27 calls into question whether the Raposos truly intended to withdraw their counteroffer. We disagree.

Abreu testified that during her meeting with the Raposos on September 26, Jose was adamant about selling the ranch whereas Laura seemed very reluctant. Abreu also testified she called Jose's personal phone several times to ask about the letter after her conversation with Laura but could not reach him. Based on this testimony, the Ragos contend it was objectively reasonable for Abreu to believe that Laura was attempting unilaterally to cancel the sale against Jose's wishes. Yet there is no evidence that Jose disagreed with the letter. The fact that Laura and Jose disagreed over whether to sell the ranch on September 26, the day before their revocation, does not somehow negate the letter, and only suggests that Jose changed his mind. The Ragos do not point to anything Laura said during the phone call to suggest Jose was not in agreement with the letter. By Abreu's own admission, Laura confirmed orally that she did not want to go forward with the sale. Absent any evidence Jose did not consent to the contents of the letter, which expressed a clear intention to stop the sale, it was unnecessary for Abreu to also obtain oral confirmation from Jose to revoke the counteroffer.

Finally, the Ragos contend the Raposos' intent regarding the sale of their ranch is a question of fact that cannot be determined by summary judgment because interpretation of the letter depends on the credibility of extrinsic evidence. The Ragos argue that the Raposos' intent cannot be ascertained without taking into account Abreu's testimony that Laura and

Jose initially disagreed over whether to sell the property, and her own confusion over the letter's meaning. But while extrinsic evidence can be used to interpret a written instrument, it cannot be used to give the instrument a meaning to which it is not reasonably susceptible, as the Ragos attempt to do here. (*Parsons v. Bristol Development Co.*, *supra*, 62 Cal.2d at p. 865.)

### 3. The Raposos' Failure To Reference Their Status as Trustees in the September 27 Letter Was Immaterial

The Ragos contend the Raposos' failure to reference their status as trustees in their September 27 letter raises a triable issue of material fact as to the validity of the revocation because the Raposos, as individuals, lacked the authority to withdraw the counteroffer on behalf of the trust. We disagree.

As the Raposos point out in their responding brief, this contention raises a legal question, not a factual dispute. It is undisputed that Laura and Jose signed the letter without indicating their trustee status. The question is whether their failure to indicate their trustee status in the letter rendered the revocation ineffective. Existing case law tells us it does not, and the Ragos failed to cite any contrary authority to support their argument.

When a property is held in a revocable inter vivos trust, the settlors and trustees have the power during their lifetimes to direct the sale of the real property. (*Galdjie v. Darwish* (2003) 113 Cal.App.4th 1331, 1349.) In *Galdjie*, the court held a contract of sale in an action for specific performance seeking to compel settlors/trustees to convey title to property held in a revocable inter vivos trust was not fatally defective for failing to name the trustees in their representative capacity as well as their individual capacity. The *Galdjie* court reasoned that the trustees in their individual capacity had full power to convey property because a revocable inter vivos trust was merely "a probate avoidance device." (*Ibid*.) The signatures of the trustees in

11

their individual capacities on documents related to property owned by the trust are sufficient to convey good title. (*Id.* at pp. 1349–1350; see *Zanelli v. McGrath* (2008) 166 Cal.App.4th 615, 634 [individual nominally holding title as trustee of a living trust has the " ' "equivalent of full ownership" ' " of the property].)

The same analysis applies here. The summary judgment record establishes that the ranch is held in a revocable inter vivos trust, and that the Raposos, as the sole trustees and beneficiaries of their living trust, had the power to direct the sale of real property owned by the trust. It is therefore immaterial whether the Raposos signed the letter without referencing their representative capacity as trustees.

## III. DISPOSITION

The judgment is affirmed. The Raposos are awarded their costs on appeal.

STREETER, Acting P. J.

WE CONCUR:

BROWN, J.
GOLDMAN, J.

12